AO 106 (Rev. 04/10) Application for a Search Warrant *(Page 1)*

UNITED STATES DISTRICT COURT
for the
Northern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>(1) THE PREMISES LOCATED AT 101 S<br>   PEARL STREET, APARTMENT W6B,<br>   ALBANY, NY 12207;<br><br>(2) A 2006 BLUE SAAB CONVERTIBLE<br>   BEARING NEW YORK LICENSE<br>   PLATE KHG1516, VIN<br>   YS3FD79Y366002226;<br><br>(3) 2016 RED CHEVROLET PICK-UP<br>   TRUCK BEARING NEW YORK<br>   LICENSE PLATE 46176MM, VIN<br>   1GCVKREC7GZ287379; AND<br><br>(4) THE PERSON OF ROBERT FILLION. | )<br>)<br>)  Case No.    1:24-MJ- 280 - CFH<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property: *(identify the person or describe the property to be searched and its given location)*:

See Attachment A-1, A-2, A-3, and A-4.

located in the ___Northern___ District of ___New York___ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒   evidence of a crime;
☒   contraband, fruits of crime, or other items illegally possessed;
☒   property designed for use, intended for use, or used in committing a crime;
☐   a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 39A | Aiming a Laser Pointer at An Aircraft |

The application is based on these facts:

See attached affidavit.

AO 106 (Rev. 04/10) Application for a Search Warrant *(Page 2)*

☒    Continued on the attached sheet.

☐    Delayed notice of _____ days (give exact ending date if more than 30 days):   Click here to enter a date. is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael DiCaprio, FBI Special Agent
_____
*Printed name and title*

Attested to by the affiant in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Date:        June 12, 2024              _____
                                        *Judge's signature*

City and State:   Albany, NY            Hon. Christian F. Hummel, U.S. Magistrate Judge
                                        _____
                                        *Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF:

(1) THE PREMISES LOCATED AT 101 S
    PEARL STREET, APARTMENT W6B,
    ALBANY, NY 12207;

(2) A 2006 BLUE SAAB CONVERTIBLE
    BEARING NEW YORK LICENSE
    PLATE KHG1516, VIN
    YS3FD79Y366002226;

Case No. $1:24-mj-280$ (CFH)

(3) 2016 RED CHEVROLET PICK-UP
    TRUCK BEARING NEW YORK
    LICENSE PLATE 46176MM, VIN
    1GCVKREC7GZ287379; AND

(4) THE PERSON OF ROBERT FILLION.

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
## FOR A WARRANT TO SEARCH AND SEIZE

I, **Michael DiCaprio**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search (1) the premises known as 101 South Pearl Street,

apartment W6B, Albany, NY 12207 ("SUBJECT PREMISES"), and any locked or closed

containers contained therein, including storage areas, mailboxes, and trash containers under the

control of the occupants of the residence; (2) a 2006 blue Saab convertible sedan bearing New

York State Registration KHG1516 with VIN YS3FD79Y366002226 ("SUBJECT SAAB"); (3) a

2016 red Chevrolet Silverado pick-up truck bearing New York State Registration 46176MM with

VIN 1GCVKREC7GZ287379 ("SUBJECT CHEVROLET", and together with the SUBJECT

SAAB, the "SUBJECT VEHICLES"), and (4) the person of ROBERT FILLION, as described in

Attachment A-1, A-2, A-3, and A-4, for the evidence, contraband, fruits, instrumentalities, and things described in Attachment B.

2.      I have been a Special Agent of the FBI for over 16 years. Since September of 2019, I have been assigned to the Joint Terrorism Task Force (JTTF) of the Albany Field Office, where, among other things, I am responsible for conducting national security investigations of potential violations of federal criminal law. Prior to that assignment I served over 11 years on the JTTF at the John F. Kennedy International Airport Resident Agency (JFKRA) of the New York Field Office. Over the course of my time as a Special Agent, I have received training and have experience in criminal and national security investigations, as well as matters involving domestic and international terrorism, and have been afforded the opportunity to work on a significant number of criminal investigations involving cellular telephones, including historical and prospective cell-site data from wireless providers, as well as tracking devices on vehicles. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 39A [Aiming a Laser Pointer at An Aircraft] (the "Subject Offense") have been committed by FILLION

and others known and unknown. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5.       The United States, including the Federal Bureau of Investigation (FBI), is investigating violations of the Subject Offense by Robert Fillion ("FILLION") and others unknown occurring in April 2024. There is probable cause to believe that FILLION knowingly aimed the beam of a laser pointer at an aircraft operating in the special aircraft jurisdiction of the United States, or at the flight path of such an aircraft from the SUBJECT PREMISES, and that evidence of FILLION's alleged activity is stored at the SUBJECT PREMISES, in the SUBJECT VEHCILES, and/or on the person of ROBERT FILLION.

### Initial Communication with the Federal Aviation Administration

6.       On April 12, 2024, Air Traffic Control Tower (ATC) personnel with the Federal Aviation Administration (FAA) located at Albany International Airport ("Albany Airport") advised that six laser strike incidents had occurred between April 6 and April 10, 2024. Upon review, it appeared that all of the incidents were reported to have occurred in close proximity to each other, in a position a few miles Southeast of the Albany Airport, near the Hudson River.

7.       The FAA advised that there were two separate incidents on April 8, 2024, one at 10:30 p.m. and one at 10:48 p.m. At 10:30 p.m., a pilot advised the Albany Airport ATC that a green laser was observed, from the 2 o'clock direction, while the plane was descending. The other aircraft was a Southwest flight and members of that aircraft also advised that there was a laser observed from about 2 o'clock as they descended to the Albany Airport.

8.       The FAA ATC advised that on April 10, 2024, at approximately 12:13 a.m. Eastern Standard Time (EST) they received notification of a laser strike incident that had the most detailed

reporting regarding point of origin of the laser. The April 10 incident involved a medical transport helicopter, with call sign DHART1 (the "DHART1 Helicopter").[1] While on final approach into the Albany Medical Center (AMC), approximately 6 miles Southeast of Albany International Airport, over the Hudson River, the DHART1 Helicopter was struck by a green laser. The laser was reported to have originated from the sixth floor of the North facing side of a large apartment building located near the Hudson River and just South of a major highway interchange, which was estimated to be the major highway interchange where Interstate Highway 787 intersects with the Dunn Memorial Bridge and Route 9, crossing the river into Rensselaer, NY.

### Identification of Dartmouth Hitchcock Advanced Response Team DHART 1 Flight

9.      On April 15, 2024, I interviewed P.A., the Metro Aviation Site Manager responsible for overseeing the Dartmouth Hitchcock Advanced Response Team (DHART) program. The Metro Aviation Site Manager stated as follows:

> a. Metro Aviation Inc. holds a contract to provide medevac and medical transport services for the Dartmouth Hitchcock Medical Center (DHMC) located in Lebanon, New Hampshire.
>
> b. All services provided to DHMC are conducted under the DHART program, with aircrafts utilizing DHART call signs.
>
> c. Upon being notified of the April 10, 2024, laser strike incident, the Site Manager reviewed Metro Aviation records and confirmed that a Metro Aviation helicopter utilizing call sign "DHART 1" was involved in the laser-strike incident. The Site Manager explained that the DHART1 Helicopter was

---

[1] Based on training and experience, I understand that the helicopter was associated with the Dartmouth Hitchcock Advanced Response Team (DHART), a helicopter EMS service associated with the Dartmouth Hitchcock Medical Center. https://www.dartmouth-hitchcock.org/dhart

transporting a patient from Cheshire Medical Center (CMC), located in Keene, New Hampshire, to Albany Medical Center (AMC) in Albany, NY.

d. The DHART1 Helicopter originated at DHMC, in Lebanon, departing at approximately 10:45pm EST on April 9, 2024. From DHMC, the Helicopter traveled to CMC, in Keene, where it picked up the patient for transport to AMC. The DHART1 Helicopter departed CMC at approximately 11:33 p.m. EST and landed at AMC at approximately 12:14 a.m. on April 10, 2024. The laser strike incident is reported to have happened a few minutes prior to landing at AMC.

10.     Subsequent FBI interviews of identified crew members, including pilot C.B. and registered nurse N.R, of the DHART1 Helicopter revealed that the laser strike incident occurred approximately six minutes prior to landing at AMC. According to the crew members, the DHART1 Helicopter was just West of the Hudson River and the major interchange of I-787 and the Dunn Memorial Bridge interchange at the time of the incident. At that time, crew members reported the DHART1 Helicopter was struck by a green laser, which illuminated the entire cockpit. The laser was described to have initially struck the rear of the aircraft from it's 9 o'clock position. The laser then moved along the aircraft and eventually entered the cockpit. Crew members estimated the incident lasted approximately 15 to 30 seconds. Furthermore, the laser was described to have originated from a window located on the sixth floor of a high-rise apartment building, just South of the DHART1 Helicopter's position and West of the Hudson River/major highway interchange. The window was located on the North facing side of the building and was just West of the center of the building. Given the hour of the incident, crew members noted that there were not many lights on in the building, and the window stood out as being the only window emanating light. In

addition to the green laser light, crew members also noticed red neon lights coming from the window of the laser. Crew members advised that they took appropriate safety precautions after becoming aware of the laser strike incident, which did not make direct contact with their eyes. No injuries were reported and the aircraft was able to continue on final approach and land at AMC without further incident.

11.    Upon landing, crew members conducted a review of Google Maps and estimated the address of the high-rise apartment building to be in the vicinity of 99 S Pearl Street, Albany, NY (South Mall Towers Apartments). One of the crew members captured a screenshot of the target building and circled, in red, the estimated area of the building where the laser originated. The crew member provided a copy of the above-mentioned screenshot to Interviewing Agent, which is copied below. The building captured in the below screenshot coincides with the South Mall Towers apartment building located at 101 S Pearl Street, Albany, NY (i.e. the location of the SUBJECT PREMISES).



## Surveillance Activity at South Mall Towers Apartment Complex

12.    On April 30, 2024, FBI spot check surveillance of the South Mall Tower Apartment Complex, where the Subject Premises is located, revealed a window located on the North-facing side of the building, on the sixth floor, and four columns to the West of the center of the building. The window was illuminated with blue ornamental lights and what appeared to be large ornamental snowflakes hanging in the window that were flashing red and green. I photographed the apartment building and window of the premises, which are copied below.



Image of the South Mall Tower target apartment building. The center of the building is delineated by the tall column that extends past the roof line.



Image captures the target window that is illuminated with blue lights and is located six rows up and four columns to the right of the center of the building.



Image captures a closer view of the target window and reveals the ornamental snowflakes illuminated in green and red.

### Interview of Executive Director of the South Mall Towers Apartment Complex

13.     On May 2, 2024, FBI personnel interviewed the Executive Director of the South Mall Towers apartment complex (the "Director"), who has worked in that capacity for more than 26 years and is very familiar with the day-to-day operations and more than 350 residents. The

Director explained that the apartment complex is designed for senior living so all residents are elderly.

14.     After being advised of the April 10, 2024, laser strike incident and upon viewing images of the sixth-floor target window, the Director estimated that the apartment was located on the sixth floor, on the West side of the building, and that the identified apartment window would be associated with an apartment with the naming convention "W6." The Director then reviewed a list of residents at the South Mall Towers and advised that the resident who resides in apartment "W6B" is the person suspected of being responsible for the incident. The Director provided the resident's name to be Robert Fillion (FILLION) and advised that the location of the sixth-floor target window is consistent with the location of unit W6B.

15.     The Director also explained that in the past she has received complaints from other residents at the complex that FILLION was harassing them with a laser.  The Director could not recall exact dates, but advised that in 2023, she received multiple complaints from an elderly, mentally handicapped female resident who lived in an apartment located in the apartment building across from the main apartment building, where FILLION resides. Both apartment buildings are co-located in the South Mall Towers complex. The female complained that on multiple occasions she was struck in the eyes with a green laser that appeared to be coming from the apartment building located across from her. After being advised of the incident the Director recalled speaking with FILLION about the matter. The Director explained that she suspected FILLION was involved in the incident on account of the female complainant's recollection of the point of origin of the laser, combined with her knowledge that FILLION possessed a "construction-grade" laser as part of his work as a general handyman contractor. The Director stated that FILLION has been heard bragging about his skills in the construction field, as well as having the best equipment,

including a laser. The Director recalled that during the conversation with FILLION, he admitted to pointing the laser at the female complainant. At that time, the Director asked FILLION to stop harassing the residents, to which FILLION complied.

16.     The Director did not receive any further complaints until the Summer of 2023, when she received similar complaints from a different handicapped female resident who lived in the apartment building across from the main building. Again, the Director spoke with FILLION, who admitted to shining the light at the female complainant for the purpose of teasing her. The Director again instructed FILLION to stop harassing residents or she would have to notify law enforcement.

17.     FILLION was compliant and the Director did not receive any further complaints of laser activity until January 2024, when the Director was notified that a New York State Police (NYSP) Trooper, while on patrol, in a marked NYSP cruiser, in the vicinity of the South Mall Towers complex, was struck by a green laser.

18.     In addition to the above-mentioned laser strike incidents, the Director recalled that in or around November or December of 2023, the Director's secretary reported that she had been struck in the eye by a green laser while she was driving her car in the vicinity of the South Mall Towers Apartment Complex. The secretary advised the Director that the laser had originated from the main South Mall towers apartment building. Although FILLION was never confirmed to be responsible for the incident, the Director assumed he was responsible on account of his history with the laser.

19.     The Director advised that law enforcement was never contacted regarding the above-mentioned laser strike incidents. FILLION is known throughout the apartment complex, to have a loud personality. As such, all of the residents that had previously reported on FILLION,

did not want their name associated with the complaints for fear that they would anger FILLION and bring unwanted attention to themselves. The Director thought the best course of action was to confront the matter directly with FILLION without disclosing the source of the complaint or involving law enforcement.

20.     The Director believes that FILLION's repeated activity involving the laser is a compulsion and although he is not viewed as a serious threat to the residents of the South Mall Towers, the Director is concerned with FILLION's potential targeting of commercial and medical transport aircraft.

## Interview of Executive Director's Secretary at the South Mall Towers Apartment Complex

21.     On May 15, 2024, FBI personnel interviewed the Executive Director's Secretary at the South Mall Towers apartment complex ("the Secretary"), regarding her reported laser strike incident. The Secretary could not recall the exact date, but estimated that the incident occurred approximately five or six months ago (estimated to be in about November or December 2023). The Secretary regularly parks her vehicle in the parking lot located on Grand Street, across the street from the South Mall Towers apartment complex. At the time of the incident, the Secretary recalled that it was dark outside, when she exited the main apartment building at the South Mall Tower complex and walked to her vehicle, which was parked in the Grand Street parking lot. After getting into her vehicle and prior to pulling out of her parking spot, the Secretary noticed a light entering her vehicle and striking the dashboard. The Secretary recalled the light going away and then briefly reappearing, a few seconds later, striking her in her eyes. She was unsure, but recalled the light may have been green. She estimated the light originated from the main South Mall Towers apartment building, but could not determine the exact point of origin. Since the incident, she has not experienced any similar activity.

**Communication with New York State Police Regarding Reported Laser Strike Activity**

22.     On May 8, 2024, FBI personnel sent a canvas request to NYSP operating out of the New York State Capital complex, in attempt to identify NYSP personnel that were involved in the previously mentioned laser strike incident that was reported to have occurred in January of 2024 and involved an NYSP marked patrol car, and Trooper being lased, while on patrol, by a green laser originating from the South Mall Towers apartment complex located at 101 S Pearl Street, Albany, NY (the SUBJECT PREMISES). In response to the canvas request, FBI personnel received two positive responses as detailed below.

23.     On May 14, 2024, FBI personnel made telephonic contact with a NYSP Trooper who is stationed at the New York State Capital complex ("Trooper 1") and on October 29, 2023, at about 11:04pm EST, while working an overnight shift, he responded to the South Mall Arterial road to attend to a call for service involving a disabled vehicle. The disabled vehicle was parked in the right lane on the South Mall Arterial, heading toward the Capital complex, in the vicinity of the MVP Arena. Trooper 1 stressed that the weather was cold, and it was dark outside at the time. After attending to the disabled vehicle, while walking back to his cruiser, Trooper 1 observed a green light appear in the area of his chest. He then looked up and noticed a green beam of light, which he was able to trace back to the apartment complex, later identified as the South Mall Towers apartment complex. Trooper 1 explained that there were two towers located on the apartment complex, and the green beam of light was originating from the shorter of the two towers. Specifically, Trooper 1 was able to see the beam of light coming from a window located in the vicinity of the middle to upper-middle section of the building. Trooper 1 advised that the beam of light only made contact with him for a few seconds, and at no time did the light make contact with his eyes, before it disappeared. He further added that he had no other contact with

the green light.

24. On May 15, 2024, FBI personnel made telephonic contact with a NYSP Trooper who is stationed at the New York State Capital complex ("Trooper 2") and advised that some time toward the end of December of 2023, beginning of January 2024, he was on patrol on the South Mall Arterial, heading Southbound, toward the Hudson River. At that time, he was involved in a vehicle stop in the Southbound lane in the vicinity of the Grand Street overpass. Trooper 2 was uncertain, but believed he was working the overnight shift as it was dark outside and the overnight was not a normal shift for him. Before exiting his cruiser to address the vehicle stop, Trooper 2 observed a green light illuminate the entire dashboard of his cruiser. Trooper 2 advised that the green light only made contact with his cruiser for a few seconds and appeared to scan across the vehicle before disappearing. Upon noticing the light, Trooper 2 looked up and observed a green beam of light, which he was able to trace back to the apartment complex, later identified as the South Mall Towers apartment complex. Trooper 2 explained that there were two towers located on the apartment complex, and the green beam of light was originating from the shorter of the two towers. Specifically, Trooper 2 was able to see the beam of light coming from the upper-middle section of the building. Trooper 2 advised that at no time did the green light make contact with his eyes. He further added that he had no other contact with the green light, and he did not report the incident.

25. The two laser strike incidents involving NYSP mentioned above, combined with the previously mentioned past laser strike activity where FILLION claimed responsibility, show consistent reporting regarding point of origin of the laser, which is in close proximity to the target window associated with apartment W6B of South Mall Towers main apartment building located at 101 S Pearl Street, Albany, NY 12207 (i.e., the SUBJECT PREMISES).

26.     In my training and experience, these reported incidents represent a consistent pattern of laser activity, and it is probable that the responsible individual is FILLION. Furthermore, given that he continues to operate as a construction handyman, and the most recent laser activity occurred on April 10, 2024, it is likely that FILLION remains in possession of a device capable of emitting the reported green laser, and said device is likely stored at the SUBJECT PREMISES.

27.     In my training and experience, individuals who are involved in laser incidents may collect photographs and videos of potential targets to strike with their laser and may also collect and store photographs and videos of the laser incidents to show to others. Such individuals may also store such photographs and videos on their cellular phone, which can be stored on their person or in their vehicle, as well as at their residence.

## Identification of FILLION's Vehicles

28.     New York State Department of Motor Vehicle (NYSDMV) records revealed that FILLION has a 2006 blue Saab 9-3 convertible sedan bearing New York state registration KHG1516 and Vehicle Identification Number (VIN) YS3FD79Y366002226 (SUBJECT SAAB), as well as a 2016 red Chevrolet Silverado Pick-Up Truck bearing New York state registration 46176MM and VIN 1GCVKREC7GZ287379 (SUBJECT CHEVROLET), as registered vehicles in his name. Additionally, NYSDMV records revealed FILLION to have an active driver's license under the name Robert A. Fillion, with a birth year in 1962, and an address of 101 S Pearl Street, W6B, Albany, NY 12207 (the SUBJECT PREMISES).

29.     On May 15, 2024, FBI personnel conducted follow-on interview of the South Mall Towers apartment complex Director in order to obtain vehicle information regarding FILLION. The Director advised that FILLION has two vehicles: one of the vehicles is a red

pick-up truck bearing New York registration 46176MM (SUBJECT CHEVROLET), which

FILLION is assigned parking spot 45 to park the vehicle; the other vehicle is a blue Saab

convertible sedan bearing New York registration KHG1516 (SUBJECT SAAB), which

FILLION is assigned parking spot 36 to park the vehicle. The Director explained that the South

Mall Towers parking lot is a private parking lot, and is located on Hamilton Street, underneath

the South Mall Arterial.

      30.     On May 16, 2024, FBI personnel conducted surveillance activity at the South Mall

Tower parking lot and observed the SUBJECT CHEVROLET parked in spot number

45. Additionally, the SUBJECT SAAB was observed parked in spot number 36. Images of the

above-mentioned vehicles were captured and are included below.



Images of SUBJECT CHVROLET parked in spot 45



Images of SUBJECT SAAB parked in spot 36

**FILLION Observed at the South Mall Towers Apartment Complex**

31.    On June 10, 2024, FBI personnel had follow-on communication with the South Mall Towers apartment complex Director in order to identify FILLION entering or exiting the SUBJECT PREMISES. The Director reviewed South Mall Towers apartment complex Closed Circuit Television (CCTV) footage and advised that FILLION was last observed outside of his apartment unit on June 9, 2024. The Director captured still images of FILLION arriving at the apartment complex, utilizing the elevator, and then entering the SUBJECT PREMISES. The still images provided by the Director are detailed below.

32.     On June 9, 2024, at 9:50 P.M. Eastern Standard Time (EST), FILLION is

observed entering the main entrance of the apartment complex and walking toward elevator.



33.     On June 9, 2024, at 9:51 P.M. EST, FILLION is observed entering the elevator and

then at 9:52 P.M. EST, FILLION is observed entering the SUBJECT PREMISES.





## TECHNICAL TERMS

34.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    b.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same
state.

c. Storage medium: A storage medium is any physical object upon which computer
data can be recorded. Examples include hard disks, RAM, floppy disks, flash
memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

35.     As described above and in Attachment B, this application seeks permission to
search for records that might be found at the SUBJECT PREMISES, in the SUBJECT
VEHICLES, and on the person of FILLION, in whatever form they are found. One form in
which the records might be found is data stored on a computer's hard drive or other storage
media. Thus, the warrant applied for would authorize the seizure of electronic storage media or,
potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

36.     *Probable cause.* I submit that if a computer or storage medium is found at the
SUBJECT PREMISES, in the SUBJECT VEHICLES, and on the person of FILLION, there is
probable cause to believe those records will be stored on that computer or storage medium, for at
least the following reasons:

> a. Based on my knowledge, training, and experience, I know that computer files or
> remnants of such files can be recovered months or even years after they have been
> downloaded onto a storage medium, deleted, or viewed via the Internet.
> Electronic files downloaded to a storage medium can be stored for years at little
> or no cost. Even when files have been deleted, they can be recovered months or
> years later using forensic tools. This is so because when a person "deletes" a file

on a computer, the data contained in the file does not actually disappear; rather,
that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or
slack space—that is, in space on the storage medium that is not currently being
used by an active file—for long periods of time before they are overwritten. In
addition, a computer's operating system may also keep a record of deleted data in
a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular,
computers' internal hard drives—contain electronic evidence of how a computer
has been used, what it has been used for, and who has used it. To give a few
examples, this forensic evidence can take the form of operating system
configurations, artifacts from operating system or application operation, file
system data structures, and virtual memory "swap" or paging files. Computer
users typically do not erase or delete this evidence, because special software is
typically required for that task. However, it is technically possible to delete this
information.

d. Similarly, files that have been viewed via the Internet are sometimes
automatically downloaded into a temporary Internet directory or "cache."

37.     *Forensic evidence.* As further described in Attachment B, this application seeks
permission to locate not only computer files that might serve as direct evidence of the crimes
described on the warrant, but also for forensic electronic evidence that establishes how
computers were used, the purpose of their use, who used them, and when. There is probable

cause to believe that this forensic electronic evidence will be on any storage medium at the
SUBJECT PREMISES, in the SUBJECT VEHICLES, and on the person of FILLION because:

    a. Data on the storage medium can provide evidence of a file that was once on the
storage medium but has since been deleted or edited, or of a deleted portion of a
file (such as a paragraph that has been deleted from a word processing file).
Virtual memory paging systems can leave traces of information on the storage
medium that show what tasks and processes were recently active. Web browsers,
e-mail programs, and chat programs store configuration information on the
storage medium that can reveal information such as online nicknames and
passwords. Operating systems can record additional information, such as the
attachment of peripherals, the attachment of USB flash storage devices or other
external storage media, and the times the computer was in use. Computer file
systems can record information about the dates files were created and the
sequence in which they were created, although this information can later be
falsified.

    b. As explained herein, information stored within a computer and other electronic
storage media may provide crucial evidence of the "who, what, why, when,
where, and how" of the criminal conduct under investigation, thus enabling the
United States to establish and prove each element or alternatively, to exclude the
innocent from further suspicion. In my training and experience, information
stored within a computer or storage media (e.g., registry information,
communications, images and movies, transactional information, records of
session times and durations, internet history, and anti-virus, spyware, and

malware detection programs) can indicate who has used or controlled the
computer or storage media. This "user attribution" evidence is analogous to the
search for "indicia of occupancy" while executing a search warrant at a residence.
The existence or absence of anti-virus, spyware, and malware detection programs
may indicate whether the computer was remotely accessed, thus inculpating or
exculpating the computer owner. Further, computer and storage media activity
can indicate how and when the computer or storage media was accessed or used.
For example, as described herein, computers typically contain information that
log: computer user account session times and durations, computer activity
associated with user accounts, electronic storage media that connected with the
computer, and the IP addresses through which the computer accessed networks
and the internet. Such information allows investigators to understand the
chronological context of computer or electronic storage media access, use, and
events relating to the crime under investigation. Additionally, some information
stored within a computer or electronic storage media may provide crucial
evidence relating to the physical location of other evidence and the suspect. For
example, images stored on a computer may both show a particular location and
have geolocation information incorporated into its file data. Such file data
typically also contains information indicating when the file or image was created.
The existence of such image files, along with external device connection logs,
may also indicate the presence of additional electronic storage media (e.g., a
digital camera or cellular phone with an incorporated camera). The geographic
and timeline information described herein may either inculpate or exculpate the

computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence

of counter-forensic programs or anti-virus programs (and associated data) may be
relevant to establishing the user's intent.

38.     *Necessity of seizing or copying entire computers or storage media.* In most cases,
a thorough search of a premises for information that might be stored on storage media often
requires the seizure of the physical storage media and later off-site review consistent with the
warrant. In lieu of removing storage media from the premises, it is sometimes possible to make
an image copy of storage media. Generally speaking, imaging is the taking of a complete
electronic picture of the computer's data, including all hidden sectors and deleted files. Either
seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded
on the storage media, and to prevent the loss of the data either from accidental or intentional
destruction. This is true because of the following:

  a. The time required for an examination. As noted above, not all evidence takes the
     form of documents and files that can be easily viewed on site. Analyzing
     evidence of how a computer has been used, what it has been used for, and who
     has used it requires considerable time, and taking that much time on premises
     could be unreasonable. As explained above, because the warrant calls for forensic
     electronic evidence, it is exceedingly likely that it will be necessary to thoroughly
     examine storage media to obtain evidence. Storage media can store a large
     volume of information. Reviewing that information for things described in the
     warrant can take weeks or months, depending on the volume of data stored, and
     would be impractical and invasive to attempt on-site.

  b. Technical requirements. Computers can be configured in several different ways,
     featuring a variety of different operating systems, application software, and

configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

39. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## Conclusion

40. I submit that this affidavit supports probable cause for a warrant to search the SUBJECT PREMISES, the SUBJECT VEHICLES, and the person of ROBERT FILLION, as described in Attachments A-1, A-2, A-3, and A-4, and seize the items described in Attachment B.

Respectfully submitted,

Michael P. DiCaprio
Special Agent
Federal Bureau of Investigation

Affidavit submitted and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 12 day of ~~May~~ June 2024.

Hon. Christian F. Hummel
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A-1**

### *Property to Be Searched*

The property to be searched is 101 S Pearl Street, Apartment W6B, Albany, NY 12207 ("SUBJECT PREMISES"). The area to be searched includes all rooms, annexes, attics, basements, porches, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers, locked containers and safes, cabinets, rooms, sheds and outbuildings associated with this property, as well as any computers, cellular telephones, tablets, computer equipment, computer storage media, and electronic storage media found during said searches.

The SUBJECT PREMISES described as a one-bedroom, 648 square foot apartment located on the sixth floor of a nine-story apartment building located within the South Mall Towers apartment complex, on Van Zandt Street, in between S Pearl and Grand Streets in Albany, NY. There is only one entrance to the SUBJECT PREMISES, which is identified by the characters "W6B' on the door. The overhead view of the South Mall Tower Apartment complex as well as the exterior window of the SUBJECT PREMISES and the SUBJECT PREMISES floorplan are depicted in the photographs below:



Image of the South Mall Towers Apartment complex with the main apartment building marked with the address 101 S Pearl St Apartment.



Image of the Main Entrance to the South Mall Tower apartment building located at 101 S Pearl Street, Albany, NY.



Image of the Window associated with apartment unit W6B, which is highlighted by a red circle.



Image of Unit W6B one-bedroom apartment floor plan

## ATTACHMENT A-2

### *Property to Be Searched*

The property to be searched is a 2016 red Chevrolet Silverado pick-up truck bearing New York State Registration 46176MM with VIN 1GCVKREC7GZ287379 ("SUBJECT CHEVROLET").

Images of the SUBJECT CHEVROLET are depicted in the images below:



## ATTACHMENT A-3

### *Property to Be Searched*

The property to be searched is a 2006 blue Saab convertible sedan bearing New York

State Registration KHG1516 with VIN YS3FD79Y366002226 ("SUBJECT SAAB").

Images of the SUBJECT SAAB



## ATTACHMENT A-4

### *Person to Be Searched*

The person to be searched is Robert Fillion, date of birth  1962.

A photograph of Fillion is provided below:

 

## **ATTACHMENT B**

### *Particular Things to be Seized*

1.      All records relating to violations of 18 U.S.C. § 39A [Aiming A Laser Pointer At

An Aircraft] by ROBERT FILLION and others unknown, occurring from at least 2023 until

April 2024, and at times not yet identified, including the following items:

> a. Records and information relating to commercial or medical transport aircraft.
>
> b. Records and information relating to interference with aircraft, including photographs and videos of aircraft.
>
> c. Records and information relating to targets of a potential laser strike.
>
> d. Records and information relating to the purchase and/or sale of a laser, including receipts and invoices.
>
> e. Records and information relating to victims of a laser incident, including notes, diary entries, and photographs.
>
> f. Records and information relating to an intent to strike an aircraft or aim the laser beam at the aircraft's flight path.
>
> g. Records and information relating to engaging in use of a laser for authorized research or sending emergency distress signals.
>
> h. Device capable of emitting a laser beam, including a construction grade laser and any accompanying accessories that allow the laser beam to function.

2.      Computers or storage media used as a means to commit the violations described

above, including aiming a Laser Pointer at An Aircraft in violation of 18 U.S.C. § 39A.

3.      For any computer or storage medium whose seizure is otherwise authorized by

this warrant, and any computer or storage medium that contains or in which is stored records or

information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.